```
                    UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF INDIANA
                        INDIANAPOLIS DIVISION


UNITED STATES OF AMERICA,        )
                                 )
                 Plaintiff       )
                                 )   NO. 1:08-cr-15-LJM-KPF-02
          -vs-                   )   Indianapolis, Indiana
                                 )   November 18, 2011
DONELLA LOCKE,                   )
                                 )
                 Defendant.      )


                         Before the

                  Honorable Larry J. McKinney

          TRANSCRIPT OF DEFENDANT'S RESENTENCING HEARING


APPEARANCES:

For the Government:      Office of the United States Attorney
                         Gayle Helart, AUSA
                         10 West Market Street, Suite 2100
                         Indianapolis, IN  46204


For the Defendant:       Jenner & Block LLP
                         By:  Landon S. Raiford and
                         Joel T. Pelz
                         355 N. Clark Street
                         Chicago, IL  60654-3456

                         Baker & Daniels LLP
                         By:   Matthew T. Albaugh
                         300 N. Merdian Street, Ste. 2700
                         Indianapolis, IN  46204


Court Reporter:          Frederick C. Pratt, CSR
                         290 U.S. Courthouse
                         Indianapolis, IN  46204

             PROCEEDINGS TAKEN BY MACHINE SHORTHAND
                 COMPUTER-AIDED TRANSCRIPTION
```

1                    (IN OPEN COURT.)

2          THE COURT:  You may be seated.  This is, as you

3    know, set for a resentencing of Donella Locke after the issue

4    has been spoken to by the 7th Circuit.

5          And the record will reflect the filing of, I guess,

6    two motions in limine.  One having to do with evidence

7    regarding relevant conduct as it relates to, I think it's

8    paragraph 71 of the presentence investigative report on the

9    calculation of the guidelines, whether two points are added

10   for 10 or more victims when the counts of conviction did not

11   add up to 10.  And the other had to do with the amount of

12   restitution, as the order of restitution reflected what I had

13   called at sentencing "relevant conduct."  I think the

14   difference between the two numbers is around a million

15   dollars.  So these two motions in limine addressed those

16   issues.

17         The point of the motions in limine by the defense is

18   that there be no new evidence added today at the sentencing

19   and that, as I understood the response, that the government

20   had in mind some further evidence that might not have been

21   entertained at the last sentencing.

22         So what I'd like to do is this.  I'd like to have five

23   or 10 minutes of your best shot on those two motions in

24   limine, and then I intend to rule on those motions in limine,

25   but not until I've heard what you have to say on the issues.

1    And then we'll proceed to resentencing under the guidelines

2    that I conclude are appropriate after hearing your arguments

3    on the motions in limine, unless you would like to stand on

4    your motions.  I have to say, I have read your motions.

5            So, what would you like to do, sir?

6            If you'd give us your name, and I'll write it down so

7    I don't forget it.

8            MR. RAIFORD:  Landon Raiford.  Raiford is

9    R-a-i-f-o-r-d.

10           The defense would like an opportunity to argue the

11   motion, if Your Honor's willing.

12           THE COURT:  Well, that's why I announced that I

13   would be willing.

14           MR. RAIFORD:  We will take you up on that offer.

15           THE COURT:  And I do have the right to limit this.

16   I don't want to go until next Thursday afternoon.  Just as

17   soon -- can you give me your best in about 10 minutes or so?

18           MR. RAIFORD:  Absolutely.

19           THE COURT:  All right.  Let me have it, Mr. Raiford.

20           MR. RAIFORD:  Thank you, Your Honor.  The 7th

21   Circuit is fairly clear that on remand the trial court is

22   limited to the evidence that it had at the time of either, A,

23   the initial trial or, B, the original sentencing.

24           We have --

25           THE COURT:  And I saw the two cases brought to my

4

1    attention by the government on those, and then I read your

2    opinion on why those two don't apply in this case.

3         What's the general reason why, on remand, a trial

4    court on sentencing is limited to what he's already heard?

5         MR. RAIFORD:  Because I think the basic principle

6    would be very unfair to the defendant when the government at

7    trial has had a full opportunity --

8         THE COURT:  Does it have any constitutional

9    implications?

10        MR. RAIFORD:  It does.  In fact, due process, 6th

11   Amendment, right to jury, all--

12        THE COURT:  Any double jeopardy problems?

13        MR. RAIFORD:  Double jeopardy as well.  All this is

14   implicated when you use the sentencing proceeding to

15   circumvent the jury trial, which when in those instances the

16   government had all the evidence needed at the time of the

17   initial trial; making the strategic decision not to put that

18   evidence into the record; makes the strategic decision not to

19   put that evidence into the record at the initial sentencing;

20   it gets appealed; it gets remanded; the government should not

21   be given a third opportunity to bolster their case.

22        In situations where the Rules of Evidence aren't

23   applied nearly as strictly --

24        THE COURT:  Tell me what you think the basic reason

25   why -- if you can say it in a sentence -- why the 7th Circuit

1   reversed this sentencing?

2          MR. RAIFORD:  Because they found there was

3   nothing -- I believe they found there was nothing in the

4   record to support either the restitution award or to hold

5   Ms. Locke accountable for the alleged relevant conduct.

6          THE COURT:  So is the problem evidentiary or is the

7   problem, I think I could use the phrase "inarticulateness of

8   the Court"?

9          MR. RAIFORD:  I believe the problem is evidentiary.

10  In this case the problem is a complete lack of evidence.

11         THE COURT:  And you draw that conclusion from what

12  part of the opinion?

13         MR. RAIFORD:  Well, I believe our arguments before

14  the Court were -- and I think the opinions adopts our

15  belief -- they presented no evidence.  For example, the 7th

16  Circuit notes all that was presented before the Court was the

17  P.S.R. report, and I believe they talk about it's just a

18  summary of names and figures, and how that is not nearly

19  sufficient to support a finding.  And I think the one case --

20  and I'm trying to keep this short -- McGowen remand.  McGowen

21  was very, very broad.  And on the second appeal the 7th

22  Circuit rejected the argument the government will make today,

23  which is on a general remand you have the opportunity to look

24  at basically whatever you want.  The 7th Circuit said no,

25  you're limited to the record before you either at trial or

1   sentencing, but the government is precluded from introducing

2   new evidence at the resentencing.

3          THE COURT:  Okay.

4          MR. RAIFORD:  Thank you, Your Honor.

5          THE COURT:  Thank you.  Good afternoon.

6          MS. HELART:  Good afternoon, Judge.

7          THE COURT:  You've heard the questions that I asked

8   Mr. Raiford.

9          MS. HELART:  Yes.

10          THE COURT:  Now would you respond to those

11   questions?

12          MS. HELART:  Well, I would respond looking at the

13   language that the 7th Circuit remanded with that was in the --

14   in my sentencing memorandum.

15          The defense would argue that we have to go back now

16   and make findings on the current record before us, but the 7th

17   Circuit already knew what the record was.  The 7th Circuit's

18   language now is "we acknowledge that the district court might

19   find, based upon sufficient evidence presented during

20   resentencing, the conduct in the unconvicted counts relevant

21   to Locke's sentencing."

22          So, if the defense reading were correct and the only

23   thing available to the Court today was the current record,

24   then the 7th Circuit's language would more likely have been

25   consistent with the statement "there's nothing in the record

1   that supports these findings," and then it could have remanded

2   with the directions for this Court to simply sentence based on

3   the record before it with the 1.1 million dollar restitution

4   for the five counts and the lower sentencing range because

5   there would not have been 10 or more victim lenders.  But

6   that's not what the language of the 7th Circuit was.  And the

7   7th Circuit already knew what the record was.

8        The 7th Circuit directed that this Court look at

9   whether Locke's conduct represents five discrete schemes to

10  defraud separate from Beverly Ross, or whether there was an

11  overarching scheme perpetrated against a number of victim

12  lenders that were encompassed by looking at the entirety of

13  Counts 2 through 37, or for certain the 14 counts that Donella

14  Locke was charged with.

15       The defense would want this Court to find that there

16  were three separate schemes; namely, Donella Locke by herself;

17  Beverly Ross by herself; and the two women together.  But, no,

18  this is a joint scheme, which will be shown by the documents

19  that were in the lender files.  There are numerous fact

20  features that show this with the evidence that the government

21  has from the investigation.

22       At sentencing there's -- the defense would also have

23  this Court believe that there was just absence of any evidence

24  relating to the issues today, but that's not true.

25       At sentencing, Locke withdrew her objection to the

1  2.3 million dollar loss amount question.  She knew by that

2  withdrawal that she was agreeing that the 2.3 million dollar

3  amount included more than the five counts of conviction.

4       She also knew that it included properties to which she

5  had been charged with her codefendant Beverly Ross.  She saw

6  the list in the P.S.R., which included victim lenders, more

7  than the five counts of conviction.  She heard the

8  government's argument that spoke of several facts relating to

9  a common plan or scheme and a scheme to defraud, and she heard

10  this Court discuss a two year time period and all the

11  attendant fraud in that time period.

12       What this remand does is not inconsistent with McGowen

13  II as the defense would argue.  It is a flushing out of what

14  is already there.  It is also consistent with Husband and

15  Sumner, where additional testimony was taken and affirmed on

16  their -- with the 7th Circuit that -- where it was taken to

17  flush out the issue that was already present at sentencing.

18  In Sumner, the remand included the agent's testimony relating

19  to similarity, regularity and temporal proximity of two

20  different drug selling events.  In Husband, taking testimony

21  from doctors and agents relating to the issue of

22  constitutional reasonableness.

23       We are flushing out evidence that will support

24  findings or not of the issues sent back by the 7th Circuit:

25       Are there 10 or more victims that were victims of a

1   common scheme or plan?

2        Was this a scheme to defraud, such that the

3   restitution amount can be supported?

4        None of this is new to Locke.  She withdrew her

5   objection to that very same amount, as it related to loss,

6   knowing full well that it related to five counts of conviction

7   and her sentencing range clearly was based on loss relating to

8   more than --

9        THE COURT:  Did the 7th Circuit note that?

10        MS. HELART:  Note what?

11        THE COURT:  Did the 7th Circuit note the withdrawal

12   of that objection?

13        MS. HELART:  I don't think that was an issue on

14   appeal because she had withdrawn it.  I mean, I do not recall

15   the parties talking about the loss amount, but we know that

16   from the sentencing record.  That was not an issue necessary

17   for appeal.

18        THE COURT:  Even in the face of that, the

19   restitution order was sent back?

20        MS. HELART:  Correct.  But it was a different issue

21   because that's a scheme to defraud and not relevant conduct

22   versus her withdrawal made the issue unnecessary, I suppose,

23   on the appeal.

24        THE COURT:  Okay.  Anything else?

25        MR. RAIFORD:  Very briefly, Your Honor.

1          THE COURT:  Sure.

2          MR. RAIFORD:  I just want to add the government's

3   point that the 7th Circuit, if it really wanted to, would have

4   been very, very explicit about exactly what can and can't be

5   done.  I think, as Posner says, though the Court is not --

6          THE COURT:  That would be Judge Posner, for the

7   record.

8          MR. RAIFORD:  Sorry.  Judge Posner says judges are

9   like pigs searching the record for trouble.  If that were the

10  case, Nobel would have come out completely different because

11  there, there was something in the trial record that had been

12  overlooked, and the Court didn't go through and search,

13  exhaust the record to find out.  So what it does is rely on

14  the District Court to go back and determine, look at what was

15  before it, and then make a decision based on the evidence

16  initially presented that could support its finding.  It's not

17  the 7th Circuit's job to go through and dig through everything

18  that was at issue and determine whether a District Court could

19  do that.

20         THE COURT:  All right.  Thank you.

21         MR. RAIFORD:  Oh, sorry, Your Honor.  One more

22  thing.  In our opening brief we did note that counsel withdrew

23  the objection.

24         THE COURT:  Okay.  So where does that leave you

25  then?

1          MR. RAIFORD:  Because the point we made at the 7th

2    Circuit was that Locke in the -- and the 7th Circuit noted

3    this twice, once in the body of the opinion and once in a

4    footnote, that Ms. Locke has always disputed she's responsible

5    for the relevant conduct.  It's one thing to withdraw the

6    objection to that alleged conduct --

7          THE COURT:  Okay.

8          MR. RAIFORD:  -- she never withdrew the objection

9    that she shouldn't be held responsible for it.

10         THE COURT:  Thank you.  Well, I appreciate the

11   briefs in this case on the issue that's now before the Court;

12   that is, the extent of the remand, what this Court is directed

13   to consider at the second sentencing hearing.

14         I appreciate you bringing it up in a motion in limine.

15   I thought it was an unusual title, but it does the job.  It

16   puts the issue to the Court, as it should be, and it gave me

17   enough time to look at it in advance so that I could make a

18   reasoned decision on it.

19         As I said, this issue goes to the one paragraph of the

20   Presentence Investigative Report.  So whether this is

21   adequately considered as a 23 on the offense level calculation

22   or a 25 isn't a very important notion for us today.

23         What I consider in arriving at that conclusion is also

24   equally important.  I looked at the direction from the 7th

25   Circuit in that comments that are made, and I read this from

12

1    page 23 of my copy, which is the advance sheet, and it says

2    this -- in the middle of the first full paragraph on that page

3    and it says -- and this is in somebody's brief -- It says,

4    "Given the lack of evidence before the District Court, and the

5    lack of an explicit adoption of a P.S.R., presentence report

6    containing an adequate relevancy analysis, we're left with the

7    definite and firm conviction that the District Court made a

8    mistake in considering the transactions underlying the

9    dismissed counts as relevant conduct."

10        Now, that very clearly tells me that the 7th Circuit's

11   opinion is that there was a lack of evidence before the Court,

12   before me, on the issue of relevant conduct.

13        Now, as a general rule, at a second sentencing, as I

14   understand the law, you don't open it up carte blanche to see

15   if the second time around evidence could be presented that

16   would have supported the Court's conclusion the first time

17   around.  That's not the law of the 7th Circuit.

18        There were those cases that are cited by both counsel

19   on the issue, which appear in the McGowen I and II, and the

20   other case's name I can't recall.  The point is those are

21   specific fact sensitive cases, as is this one.

22        So I just read you what I think is the holding in this

23   case.  And that does not mean that I can't read what counsel

24   for the government just read me.  That's also in the case.

25   It's on page 24 where it says, "At the same time, we

1   acknowledge that the District Court might find, based upon

2   sufficient evidence presented during resentencing, the conduct

3   in the unconvicted counts relevant to Locke's sentencing.  It

4   could then state its findings with specificity and presumably

5   enter the same sentence we vacate today."

6        Then the Court says, "We express no opinion on the

7   propriety of that outcome.  Because no particular outcome is

8   certain, we remand for resentencing."

9        I have to confess, I'm not sure exactly what that

10  means.  But I think that is cautionary to this Court regarding

11  the second sentencing, and I think it is coupled with the

12  first paragraph that I read into the record.  I think what

13  this means is that I am not to invite more evidence into this

14  case.

15       I think the motions in limine are well taken given the

16  language of this opinion, and I think even aside from the

17  language of the opinion that they are well taken.  I don't

18  believe that our system will countenance a second attempt to

19  make a record of evidence that the 7th Circuit has found was

20  not in existence the first time around.

21       So that being said more specifically, the sentencing

22  today, the resentencing is restricted to what was in the

23  record at the time that I sentenced Mrs. Locke the first time.

24  So I will not entertain evidence that wasn't there the first

25  time.

14

1          So is that clear enough?

2              MS. HELART:  That is clear.

3              THE COURT:  Okay.  All right.  And that will be

4    true -- well, that impacts both the restitution order and the

5    sentence itself.

6          Usually at a sentence I will hear from the defendant

7    first, but -- I guess it would be appropriate to do that again

8    this time.  So, Mr. Raiford, I'll hear from you and your

9    client, if you like, after consultation.

10             MR. RAIFORD:  In light of your ruling, can we have

11   maybe five minutes to think about what we -- what we should

12   just say or even maybe a couple minutes?

13             THE COURT:  You want me to step down so you have

14   privacy?

15             MR. RAIFORD:  I don't want you to have to sit up

16   there --

17             THE COURT:  Take the time you need.

18             MR. RAIFORD:  We'll just step out.

19             THE COURT:  I think I'll step down.  Let me know

20   when they're ready.

21             (Recess taken from 2:30 p.m. to 2:40 p.m.)

22             THE COURT:  You may be seated.

23         All right, counsel, you want to step up here with your

24   client?  If this had been the first sentencing of your client

25   I would invite you and she up as I do again.  And could you do

1  your best to raise your right hand, please?

2                    DONELLA LOCKE, DEFENDANT, SWORN

3             THE COURT:  The record then would reflect, counsel,

4  that your objection to the sentencing is to paragraph 71 and

5  to those paragraphs regarding the total restitution?

6             MR. RAIFORD:  That's correct.

7             THE COURT:  And then at this point I'll hear from

8  you regarding your objection to paragraph 71.  And once I

9  determine what the guidelines will be, I'll hear from you

10  again as to what you think the appropriate sentence ought to

11  be.

12             MR. RAIFORD:  Your Honor, based on your ruling

13  earlier today, you decided we are limited to what happened

14  initially.

15             THE COURT:  Yes.

16             MR. RAIFORD:  There was no evidence on the relevant

17  conduct proceeding either at trial or the initial sentencing.

18  Therefore, Ms. Locke should only be sentenced based on her

19  convicted conduct, which is Counts 8, 9, 10, 11 and 14.  The

20  Supreme Court has held that the presentence report does not

21  count because it did not have sufficient evidence.

22             I would also note the 7th Circuit noted, and I quote,

23  "The government concedes the five counts on which Locke was

24  convicted did not involve 10 or more victims."  Therefore, a

25  two point reduction should be taken into account there because

1  I believe her victim -- the victim list for victim conduct may

2  be six or maybe seven -- either six or seven.

3       I would also point out that the restitution, based on

4  the information the government provided us in the restitution

5  memorandum for convicted conduct, comes up to 423,675.51.

6       And one more point I would like to make.  That would

7  also seem to imply or require that the loss amount would be

8  for the very same.  It would not be for over a million

9  dollars, but it, too, would be at most 423,675.51.  And,

10 therefore, another two point reduction should be taken into

11 account based on that.

12      Now, counsel -- in complete disclosure, counsel did

13 withdraw that objection initially at sentencing.  The reason,

14 based on my review of the record, was when he filed his

15 objection he got a response back from the probation officer

16 which told him the loss amount for Count 9 was basically 1.1

17 million dollars.  And based on that information he withdrew

18 the objection because the convicted conduct would be over a

19 million dollars.  We now know, based on what the government

20 provided, that was not the case.

21      Therefore, I would ask the Court in fairness to make

22 sure that the loss amount adequately reflects what we know

23 restitution to be, which is about $400,000.

24      THE COURT:  The 7th Circuit mentions the figure of

25 1,371,476.51 as the amount that impacts the five counts of

17

1  conviction.

2         MR. RAIFORD:  That's correct.  And so -- I

3  understand you may be hesitant to go outside that, so maybe I

4  would ask Your Honor to take into consideration when you look

5  at the Sentencing Guidelines how you want to fit Ms.

6  Locke into the Sentencing Guidelines, the fact we know now

7  that that number is actually incorrect.  And the reason it

8  wasn't brought up to you earlier is because it seems like

9  previous counsel had been, probably, accidently misinformed as

10 to what the loss amount was for the convicted conduct.

11        THE COURT:  Are you objecting to paragraph 70 also?

12        MR. RAIFORD:  I would like to object to paragraph 70

13 also.

14        THE COURT:  And the reason for that is?

15        MR. RAIFORD:  Because we know for a fact that the

16 convicted conduct does not involve a loss amount of over one

17 million dollars.

18        THE COURT:  And what is the amount?

19        MR. RAIFORD:  According to the government, what they

20 submitted to this Court, they represent that it is 423,675.51.

21 I could break it down per count if that would help.

22        THE COURT:  No, that's not of concern to me at this

23 point.  What would that mean then that the...

24        MR. RAIFORD:  I believe what it would mean is to the

25 base offense level for this conviction is 7.  If we accept the

1  423 number for the loss amount, then you would add an

2  additional 12 points to give her a total of 19.

3          THE COURT:  Okay.  Anything else?

4          MR. RAIFORD:  That is all for now, Your Honor.

5          THE COURT:  You don't have any dispute with the

6  criminal history computation?

7          MR. RAIFORD:  I'm understanding the criminal history

8  shows I.

9          THE COURT:  It's a I, which is the lowest.

10          MR. RAIFORD:  Right.

11          THE COURT:  All right.  Thank you.

12          MR. RAIFORD:  Thank you.

13          THE COURT:  I'll hear from the government on that

14  guideline calculation.

15          MS. HELART:  Well, my understanding is that we are

16  here on two issues, and what I just heard the defense argue is

17  a third, and I'm not sure that that's properly before this

18  Court and we would object to that.

19          The loss amount is not in question here.  She withdrew

20  her objection to that.  And the calculation for that should be

21  based on the between 1 million and 2.5 because she agreed that

22  2.3 was the amount of loss.  So we definitely object to the

23  defense trying to recalculate based on that when she clearly

24  withdrew that.

25          The record at the time, which as we understand this

1   Court is holding to, the defense cannot dispute that she

2   agreed to the loss amount.  The loss amount included more than

3   the five counts of conviction and she knew that.  The scheme

4   was set forth in the indictment.  There were 13 or so victim

5   lenders in the P.S.R., which clearly included more than five

6   counts of conviction, and that would support the 10 or more

7   victims.

8          And one thing that the Court of Appeals stated is that

9   this Court did not adopt the P.S.R. officially, so we would

10  ask the Court to do that.

11         THE COURT:  I think they have more of an objection

12  to more than that.  In one place they said that I did not

13  adopt it, and then in another they say that it did, then

14  there's a further explanation as to what the gravamen of my

15  statement adopting the record was, that it wasn't sufficient,

16  and then they later find I think that the P.S.R. by itself is

17  not sufficient.

18         MS. HELART:  And I agree with that.  There was more

19  to it, but that was one of their points.  So the list of

20  victim lenders happened to agree with and be the same as the

21  amount of loss.  And today the defense would like to, I think,

22  engage in some speculation as to why the defense withdrew.

23         I could share things outside of the record as well as

24  to why the defense withdrew, but that would be entirely

25  improper, so we're asking the Court not to engage in any of

20

1  that speculation as to why defense withdrew.

2         We're asking that the Court keep the 2.3 million

3  certainly in loss.  That just seems patently clear that's

4  nothing that we're here on today.  And because of the other

5  features that it was listed in the P.S.R., it was before this

6  Court, and to keep that amount to restitution.

7         Now, if the Court -- well, I'll keep my argument to

8  that at this point.  I think that's all that the Court has

9  asked for at this point.

10        THE COURT:  I'm interested in the loss being over a

11  million dollars.  You say that isn't before the Court because

12  that's not nowhere contained in the opinion of the 7th

13  Circuit?

14        MS. HELART:  That was not an issue.  What the

15  government is saying is that was not an issue that was raised

16  on appeal.

17        THE COURT:  So the issue on appeal is paragraph 71

18  and the total amount of restitution.

19        MS. HELART:  Correct.  And the same list of victim

20  lenders was in paragraph 67 as well, and that was another

21  paragraph that she did not object to.  So that same list of

22  victim lenders supported the loss and it supported the

23  restitution.  So with her withdrawal to the loss amount,

24  implicitly she was agreeing that that was the loss amount.

25        Now, that happened to be at the sentencing the amount

1  of restitution.  As time has gone on, we have more concrete,

2  more accurate numbers for the restitution.

3          THE COURT:  And what is the number on the seven

4  counts?

5          MS. HELART:  On the five counts?

6          THE COURT:  I'm sorry, the five counts.

7          MS. HELART:  The number on the five counts of

8  conviction -- and the reason the number changed, Your Honor,

9  is that -- the number is 340,789.  The reason the numbers

10 change in mortgage fraud cases is because we work with the

11 best information we have at any given point in time.  At the

12 time of the sentencing most of these houses were in

13 foreclosure.  Some of them had gone to sheriff sales and all

14 that process takes a lot of time.  We were going from the

15 sheriff sale numbers.

16         Sometimes at the sheriff sales the bank takes the

17 property back and then sells them in a third-party --

18         THE COURT:  Is that what happened in this case?

19         MS. HELART:  The numbers are more accurate now

20 because they have been sold.  So the numbers -- I can give out

21 each one of them, but the numbers add up to 340,789 for just

22 the five counts.  We have more accurate numbers for all the 14

23 counts with which she was charged.

24         THE COURT:  Why shouldn't that make a difference at

25 this point on her resentence?  Why shouldn't that information

22

1  be used?

2         MS. HELART:  Well, there's very –– there are a lot

3  of ways that loss can be calculated.  One important way is how

4  much did the banks loan out?  And this crime is lying to

5  lenders to get them to give up their money.

6         Frankly, I need to go back and reconstruct how we ––

7  the numbers of the loans, they are listed in the indictments,

8  and see how much those added up to.  But loss amounts are

9  exceedingly difficult to come up with.  But one of the

10  features is –– one of the things we look at is how much did

11  the banks loan out?  How much loss did she cause to the bank?

12         Now, just because the bank is able to recoup, great.

13  They still do have a piece of property, but she did cause the

14  bank to loan out a lot of money.

15         THE COURT:  Okay.

16         MS. HELART:  And if I could say one more thing?

17         THE COURT:  Sure.

18         MS. HELART:  This is outside the record, but in any

19  case, including this one, based on that theory, the amount of

20  loss that the banks give out is well over 2.3 million dollars,

21  but we do try to tame it to something reasonable.  So banks

22  loan out a lot of money and, yes, they're able to recoup some

23  because they've got the property.

24         THE COURT:  So the number on paragraph 70 would not

25  always be the same as the number on restitution?

23

1          MS. HELART:  It's rarely the same.  And it was the

2    same in this case, but -- at the time of sentencing.  It is

3    different now.  It's just the point in time where the parties

4    stopped talking and we went in for sentencing.

5          THE COURT:  So the actual number on restitution on

6    these counts would be the 340,789?

7          MS. HELART:  Yes.  If the Court is asking for the

8    five counts of conviction that's the number 340,789.  And we

9    have the victim lender --

10          THE COURT:  Now, you recall in the 7th Circuit's

11   opinion the statement in which the court addresses the

12   appropriate burden on the relevant conduct issue, and that is

13   this -- it's on page 20 of my advance sheet -- "Where the

14   dismissed counts to constitute relevant conduct, the act in

15   those counts must have been both attributable to Locke and

16   also part of the single scheme common to the counts of

17   conviction."

18          Do you agree with that?

19          MS. HELART:  Yes.

20          THE COURT:  How does that impact your argument?

21          MS. HELART:  Is the Court saying that I can give you

22   information outside of the --

23          THE COURT:  No, no, just what's in the record.  If

24   there's anything in the record that supports that, that's what

25   you're permitted to argue.

24

1          MS. HELART:  Okay.  Then there is none in the

2   record, other than the list of lenders that shows that there

3   was more than five.  But we did not put that story in as to

4   the other unconvicted counts.

5          THE COURT:  Okay.  Thank you.

6          Anything else, counsel?

7          MR. RAIFORD:  Your Honor, I would like to put in the

8   record previous counsel's objections to the P.S.R. report

9   originally, as well as the response counsel received back from

10  defense counsel, as Defendant's Exhibit 1 and Defendant's

11  Exhibit 2.

12         THE COURT:  Those would be the original P.S.R.?

13         MR. RAIFORD:  It would be defense counsel's original

14  objections.

15         THE COURT:  And why do you need to do that?

16         MR. RAIFORD:  As I talked about before, I didn't

17  want to just reference something without giving Your Honor at

18  least a chance to look at it.

19         THE COURT:  I've got it right here in front of me,

20  but I don't know that it needs to be added as a separate

21  exhibit.

22         MR. RAIFORD:  Very well.  I didn't know you had it

23  before you.

24         THE COURT:  I think it's fairly obvious that the

25  appellate court read it too.

25

1          MR. RAIFORD:  The one thing we would ask Your Honor

2   to do is not hold Ms. Locke accountable for a loss amount that

3   we know now to be incorrect and that is vastly different from

4   the restitution amount.  And as you consider how to sentence

5   her, you take that into account what -- at least address the

6   situation as it currently lies.

7          THE COURT:  Okay.  Thank you.

8          MR. RAIFORD:  Thank you.

9          THE COURT:  Well, looking initially at paragraph 70

10  where it says the offense involves a loss exceeding a million

11  dollars.  It is true, as pointed out by the government's

12  counsel, that that offense characteristic calculation is not

13  the same as the actual amount of loss calculated by selling

14  what's left.  Under the guidelines, it is a loss to the bank

15  at the time, and I think that is appropriately calculated and

16  was at the time and is still as a 16.

17         Paragraph 71.  I do think that the appropriate

18  calculation under paragraph 71 is a zero instead of 2.  And I

19  think that, given my understanding of the 7th Circuit opinion

20  in this case, that that's an appropriate determination.  So we

21  will proceed then to -- well, I'll now find that the

22  appropriate adjusted offense level calculation in this case is

23  a 25 and the criminal history category is I.  And that

24  calculation leads us to a 57 to 71 recommended range.

25         I will hear now from counsel -- yes?

1          MR. RAIFORD:  Your Honor, would you mind going over

2    the calculation?  We come up to, I think, a 23.

3          THE COURT:  I'm sorry, 23 is right.  Twenty-three is

4    correct.  I said 25 and that's not right.  Twenty-three is

5    correct.  The 23 is a 57 to -- or a 46 to 67 months.  So 46 to

6    67 is the 23 range.  Thank you for pointing that out.

7          All right.  Now I'll hear from you and your client

8    again as to what you think the appropriate sentence ought to

9    be.

10         MR. RAIFORD:  Your Honor, can we have a moment to

11   speak with our client?

12   (Counsel conferring with the defendant off the record.)

13         THE COURT:  Yes, sir.

14         MR. RAIFORD:  We've spoken with our client.  She

15   doesn't wish to say anything further at this time.

16         THE COURT:  Would you like to make an argument about

17   what you think the appropriate sentence ought to be now?

18         MR. RAIFORD:  Yes, Your Honor.  For the -- in the

19   guideline range, we would ask for obviously the lowest

20   possible.

21         Ms. Locke was convicted of five counts of wire fraud.

22   We know now, even though you've ruled the loss amount could be

23   reflected to one million, actually the loss to the bank is

24   significantly less.  Even if you take the actual original loan

25   amount, it doesn't give you one million dollars.  Therefore,

27

1  we'd ask that you take that into consideration and give her

2  toward the lower amount of the sentencing range.

3       We'd also note that Ms. Locke really does not have any

4  criminal history before this.  As far as I know, she has been

5  a model citizen in prison, caused no problems, is not young

6  anymore, is not a danger to society.  I doubt there's any

7  chance that she -- when she gets out of prison that you or any

8  other judge will ever see her face again.

9       So, therefore, taking age, the nature of the crime,

10 her past behavior, her good behavior since she's been

11 sentenced, we'd ask you be as lenient as you possibly can.

12      THE COURT:  Thank you.  I'll hear from the

13 government.

14      MS. HELART:  The government realizes the Court sat

15 through the entire four day trial in this case, but some

16 highlights of how extensive this fraud was is really worth

17 noting again.

18      This case involving Counts 8, 9, 10, 11 and 14 of the

19 indictment showed that Ms. Locke went to Drees Homes officials

20 and made up a big story from the beginning.  She made up a big

21 story in two important ways.  One is she told them that she

22 needed their spec homes, spec homes that didn't have finished

23 basements, and that she wanted to find her own company to

24 finish them, and she had a story as to why she needed all that

25 they had.  Now Drees Homes officials wanted her to start

1  slowly.  They invited maybe six to seven to start off with and

2  we have the resulting 8, 9, 10, 11 and 14.

3          The basements in every one of them never got finished.

4  The money that was pulled out to finish those basements went

5  to made up companies and went into Ms. Locke's pocket.  The

6  companies had names of variations of L & K Properties, L & K

7  Interior Designs, L & K Property Management, et cetera.

8          In those properties, she also came out with realtor

9  fees on top of that and for five months made nearly half a

10  million dollars, as I recall from the amounts that the trial

11  testimony.

12          She used false social security numbers for the

13  property she bought in her own name, 9, 10, 11 and 14, and a

14  false social security number for her son Scott Locke that she

15  directed that property of Count 8 in his name.

16          She used fake invoices for these basements.  She

17  inflated her own income, her own monthly income.  We knew that

18  officially from an analysis of the bank accounts, numerous

19  bank accounts with the variations of Locke & Key, L & K, L & K

20  Property Management, et cetera.  And that the bank account

21  balances in those bank accounts could not have supported the

22  incredibly inflated amounts that she said she made it on a

23  monthly basis.

24          She submitted the down payment for Count 8, the Scott

25  Locke property.  She used in Count 10 another egregious thing,

1  which is making up false leases using family members names,

2  using other peoples names.  Pretty much, if they were an

3  acquaintance, it was fair game.

4       In three of the counts she used Tamara Clark as a

5  person to fake up two letters.  Ms. Clark's testimony was that

6  she had done work of reviewing tax returns for Scott Locke on

7  Count 8, but had not done any work and had not written the

8  letters that I believe showed up in Counts 9 and 11.  Tamara

9  Clark's name also showed up in a false way on one of these

10 false residential leases in Count 10.

11      The defense is incorrect that the five counts loan

12 amounts were not even a million.  The calculation that was

13 just done is 1.8 million.  And I have a more specific amount.

14 That's how much the banks loaned out on these five properties,

15 1.8 million on just these five counts.

16      Ms. Locke did this scheme big.  There were maybe one

17 to two payments made on each of these properties.  They all

18 went into foreclosure.  They all of them sold at sheriff

19 sales.  The only work that was ever done on any of them was

20 some work on her Count 9 Dawn Ridge property where she got the

21 $50,000 theater system ordered and then paid for a small part

22 of it.

23      She's just a menace.  She went big with her fraud.

24 I'm not convinced we won't see her again.  I think we need to

25 send her a very strong message still that fraud does not pay

1  and we are asking for 67 months in this case.

2            THE COURT:  I thank you.

3            MS. HELART:  And --

4            THE COURT:  I'm sorry.

5            MS. HELART:  -- I do have the names and I can give

6  them to probation afterwards for the victim lenders for the

7  five counts.

8            THE COURT:  Thank you.

9            MR. PELZ:  If I could -- I rise to address one thing

10 because there wasn't misspoke -- anything misspoke by

11 Mr. Raiford.  He didn't understand what I was telling him when

12 I was trying to explain the stuff in the interim.

13        The first time we ever heard any suggestion that the

14 loss amount should be calculated somewhat differently than the

15 way we calculated the loss amount at the time of the first

16 sentencing hearing was just in this presentation here today.

17 The count on which we now know there was inaccurate

18 information is Count 1.  I want to make sure on Count 9 what

19 was in the supplemental addendum of the presentence report --

20 I'm certain that's on the record from the initial time -- said

21 that the loss amount for Count 9 had been calculated at

22 1,110,267.

23        What I advised Mr. Raiford is that the information

24 we've been provided today was that the original loan amount on

25 that property was $627,738, and that if we used that entire

1   amount as the loss amount for number 9, for Count 9, and used

2   the loss amounts for the other counts as represented by the

3   government at the time of the first hearing, you'd be under a

4   million dollars.  That's what I represented to Mr. Raiford.

5   That's what he should have said and I just wanted to make sure

6   we clarified the record --

7            THE COURT:  So, you heard the government say the

8   five count loan amounts are 1.8 million.

9            MR. PELZ:  Yes.  But the government at the first

10  hearing never ever tried to calculate the amount of loss as

11  the total amount of the loan.  They were acknowledging that

12  the loss amount had to reflect the fact that they in fact got

13  the property and had value.  So they were never out that

14  entire amount.  That wasn't their loss.  They never had zero

15  value on tholes properties.  The property always had some

16  value.

17           I think what the government said at the time of the

18  hearing, they were valuing it based upon the "sheriff sale

19  amount," what they thought it was worth; that they

20  subsequently amended those using what they were actually able

21  to sell it for.  And the information we've been given out

22  tells us that sometimes that was more than what they estimated

23  and sometimes it was less than estimated.  But if we use the

24  actual amounts that -- if we use the estimated amounts, once

25  we correct -- with respect to the loss on number 9 -- if we

1  use the estimated amounts on sheriff sales we're under a

2  million dollars.  If we use the actual amount, based on what

3  they were ultimately able to sell, we're way under a million

4  dollars.  In fact, I think the government says we're now at

5  $340,000, which isn't even a third of the way to a million.

6          The only way you get above the million is to use the

7  theory that they never advocated at the initial sentencing

8  hearing in terms of how you compute loss.  It can't be --

9  there isn't evidence, not even a preponderance of the

10 evidence, that the actual loss can be based on the total loan

11 amount because they were never at risk of losing all the loan.

12 They at all times had something of value to --

13         THE COURT:  Point me to the paragraph in the

14 guidelines that tells you how to arrive at the loss figure for

15 the specific offense characteristic under 2B1.1(b)(1)(I) it

16 looks like.  What does that say?

17         MR. PELZ:  I don't know, Your Honor.

18         THE COURT:  Well, do you know?

19         MR. RAIFORD:  Sort of, yes.  I don't want to speak

20 as if the gospel truth.  I understand there's a couple ways

21 you can calculate loss under 2(b)(1) and III basically.  One

22 being the intended loss, I believe, or intended loss or the

23 actual loss.  I hope that's close enough.

24         THE COURT:  That is close enough.  And so, directly

25 responding to your concern, I don't believe that the 7th

1  Circuit said they couldn't change an argument on what's

2  already in the record.

3          MR. PELZ:  I'll accept -- I'll accept that, Your

4  Honor, for purposes of --

5          THE COURT:  You don't have to sign it or anything.

6          MR. PELZ:  I'm not going to sign anything.  I do

7  know, if we disagree, you know, only one of our opinions

8  counts.  I do know that much.

9          THE COURT:  Well...

10         MR. PELZ:  But I would say --

11         THE COURT:  Today maybe.

12         MR. PELZ:  -- if it's intended loss, it couldn't be

13 the total amount of the loan.  You can't have that.  You

14 can't -- that's not a reasonable --

15         THE COURT:  Your argument may be with the guideline

16 commissioners rather than with me.

17         MR. PELZ:  Yeah, I mean -- and they have some burden

18 of proving that.  Even that by a preponderance of the

19 evidence, they can't be that they've shown that the intended

20 loss was the entire loan amount.

21         It's very unfortunate that we have this misinformation

22 that got into the record.  Everybody was operating under this

23 misinformation.  You were.  The 7th Circuit was.  I mean,

24 there is a way to reconcile this so it will be irrelevant.  I

25 mean, I believe the highest amount you can give under 21

1   points is the same as the lowest amount you can give under 23

2   points, which is 46 months.

3        But I did want to make sure the record was clear with

4   respect to what that error was.  And it was only Mr. Raiford

5   who uncovered this.  And we didn't even uncover it based on

6   the information at the time we were in the 7th Circuit, so we

7   couldn't raise this issue in the 7th Circuit because we didn't

8   yet have enough information to feel comfortable that we were

9   right.  He suspected there was a miscalculation, but he wasn't

10  certain.

11       I just did want to try to get the record as clear as I

12  could, Your Honor, for your purpose as well as for the -- most

13  importantly for your purpose, so you can fairly consider this

14  as you make your decision here with respect to what to do.

15       And again, if Mr. Raiford misspoke, I feel it was my

16  responsibility for not having necessarily given him the right

17  information.  I was trying to say, if you used the full amount

18  for the Count 9, because that's the only one where there seems

19  to be some dispute as to what the loss was.

20       THE COURT:  Okay.  And we'll let the record remain

21  silent of where the problem is that you can't explain very

22  well or that he can't under stand very well.  How about that?

23       MR. PELZ:  Thank you.

24       THE COURT:  I call on the probation officer here --

25  and somewhat of a surprise to you -- but in the calculation

1    under the paragraph "specific offense characteristic involving

2    the loss," in calculating the loss, knowing what the amounts

3    were, that of the -- of these loans, where in the guideline do

4    we get that direction?

5            MR. JAROSH:  My guess -- not my guess.  My

6    understanding is that it's probably under application notes.

7    Probably clarified a little bit more.  2B1.1 is quite large.

8            THE COURT:  And it has to do with what the defendant

9    acquired also, doesn't it?  Isn't it what she acquired as a

10   result of her fraud?

11           MR. JAROSH:  I believe that falls under that, yes.

12           THE COURT:  I think it does too.  I think now I've

13   heard all the arguments, yes.

14           Do you want to step up here with your client, please?

15           I do find that -- as I calculated the guidelines

16   prior -- that to end up with an adjusted offense level of 23,

17   I do think that's appropriate.  And the amount of these

18   mortgages, as a specific offense characteristic under 70, is

19   appropriately calculated under the guidelines.

20           Then we start, Ms. Locke, again with each of these

21   counts could result in a total of 20 years imprisonment.  And

22   we learn that from the Congress of the United States in saying

23   that for each count, as I say, you could get 20 years.  So

24   that tells me how serious to take a wire fraud sentencing as

25   it comes before me.

1        Then, as we know, there are different wire frauds.

2   Wire fraud is the kind of statute that several, well,

3   multitudinous group of facts can support a wire fraud

4   conviction.  But in this case I look at these guidelines to

5   see how they attack the problem of determining a sentence;

6   that is, what factors do we consider?  And we look first at

7   the base offense level, and that's the generic fraud, so

8   that's a 7.  And that's the guideline commissioners' attempt

9   to arrive at a fair number that would reflect the harm caused

10  so that all of us, as we sit across the country looking at

11  wire fraud cases, can begin at the same place and then have an

12  attempt to keep these kinds of offenses somewhat consistent in

13  our sentencings.  And the loss makes a great deal of

14  difference, makes the most difference in fact, as you know in

15  your case.  I found that the over a million is appropriately

16  calculated under the guidelines, so the 16 is added.

17        And I have found that under the 7th Circuit direction

18  and under the evidence before the Court, as I had restricted

19  it by granting the motions in limine pursuant to my

20  understanding of the 7th Circuit's directive, there will be no

21  additional two points for 10 or more victims because there's

22  no finding that there were 10 or more victims.  And then

23  there's -- we do have the two for -- or didn't have those two

24  the last time either, so it arrives at the 23.

25        And I look at 3553(a) to see if the guidelines

1   appropriately reflect my concerns, and appropriately put us in

2   the range that would satisfy all of the 3553(a) factors, and I

3   look again at the nature and circumstances of the offense.

4           I did go over the nature and circumstances of the

5   offense at the original sentencing.  I was struck at that time

6   by the amount of misinformation that you gave to the

7   authorities here that loaned you this money.  The basements

8   never got finished.  The money went to your made up companies.

9   There were false social security numbers; four for you and one

10  for your son; fake invoices; inflated income statements; false

11  leases; and a couple other letters that were alleged to have

12  been written in support of some of these transactions that

13  were never in fact signed by the individuals whose names

14  appeared thereon.  I found also that this is a fairly

15  complicated scheme and a large scheme.

16          And then I looked at your history and characteristics

17  and, of course, we acknowledge that this is your only brush

18  with the criminal system.  And under the guidelines –– before

19  the guidelines I might have taken more into account the number

20  of felonies than the guidelines do, but the guidelines tend to

21  reflect the seriousness of the crime and the amount of the

22  harm, the money actually instead of the number of crimes.

23  Although I am concerned about the fact that there are five

24  crimes in this case.

25          I want this sentence to reflect the seriousness of the

1 offense and promote respect for the law and provide just

2 punishment.  Those all work together.  And those concerns are

3 generally reflected in the factors the guidelines reflect;

4 that is, the amount of money involved and the nature of the

5 scheme.  And I want to afford adequate deterrent conduct to

6 you and to others.

7         I suspect that I'm a little less concerned about your

8 future of criminal conduct than is the government in this

9 case.  But in any case, my concern again is the nature of this

10 crime and all of the different misrepresentations that were

11 made and that I've just outlined them.  The fact that there

12 are five felonies involved, that again would drive me to the

13 higher end of the guidelines.

14         And so, for those reasons I'll sentence you to 67

15 months, which is the high end of the guideline range, which I

16 think again that guideline range is a reasonable one.

17         You will make restitution in a different amount than I

18 had ordered the last time.  Restitution will be ordered in the

19 amount of 340,000 -- is it 189 or 789?

20         MR. RAIFORD:  Your Honor, the guideline range is it

21 46 to 57 months?

22         THE COURT:  Yes, 46 to 57.  Right, I'm sorry.

23         MR. RAIFORD:  I thought you said 67.

24         THE COURT:  I probably did.  I probably did.  I had

25 written that down, but it's 57.  That's wrong.  I was wrong.

39

1    I apologize.  It's 57.  I'm glad we invited you today.

2            MR. RAIFORD:  Happy to be here.

3            THE COURT:  Yes.  So it's 57 months.  And the

4    restitution amount is the $340,789.

5            We will divide that up pursuant to the list that we

6    just got presented today, which I don't have and I can't,

7    therefore, read it into the record.  The list of the victims

8    will be next to them.

9            Any payment that's not paid in full will be divided

10   proportionately among the victims named.  Payment is to be

11   made directly to the Clerk of the U.S. District Court for

12   disbursement to the victims.

13           The defendant will notify the United States Attorney

14   for this district within 30 days of any change in mailing or

15   residence address that occurs while any portion of the

16   restitution remains unpaid.

17           Any unpaid restitution balance will be paid during the

18   term of supervised release at a rate of not less than 10

19   percent of defendant's gross monthly income.

20           I find that she does not have the ability to pay

21   interest and I waive any interest requirement.  She shall

22   notify the probation officer of any material change in

23   economic circumstances that might affect her ability to pay

24   restitution.

25           I am not ordering a fine based on her financial

40

1  resources and future ability to pay.

2      Upon release from imprisonment, she will be placed on

3  supervised release for a term of two years on each count to be

4  run at the same time.

5      Within 72 hours of release from the custody of the

6  Bureau of Prisons, she shall report in person to the Probation

7  Office in the district to which she is released.

8      While on supervised release, the defendant shall not

9  commit another federal, state or local crime.  She will not

10 possess a firearm, ammunition, destructive device, or any

11 other dangerous weapon.

12     She will cooperate with the collection of a DNA sample

13 and refrain from any unlawful use of a controlled substance.

14     She is suspended from drug testing mandated by the

15 Crime Control Act of 1984 based on my determination that she

16 poses a low risk of future substance abuse.

17     Further, you shall comply with the standard conditions

18 as adopted by the Judicial Conference of the United States, as

19 well as the following additional conditions:

20     She will pay restitution that's imposed by the

21 judgment that remains unpaid at the commencement of the term

22 of supervised release.

23     She will provide the probation officer access to any

24 requested financial information; not incur new credit charges

25 or open additional lines of credit without the approval of the

41

1   probation officer; and not be self-employed, employed by

2   family or friends, or employed in the real estate or mortgage

3   industry without the permission of the probation officer.

4           I ordered her before to pay the special assessment of

5   $500, which is a hundred dollar assessment on each count.

6           That hasn't been paid or has it?  Has that been paid

7   through the Inmate Financial Responsibility Program?

8           MR. PELZ:  Not all of it, Your Honor.  Part of it.

9           THE COURT:  I won't reimpose that whole amount.

10  Whatever remains is still due.

11          You're remanded then back to the custody of the United

12  States Marshal.

13          Anything else?

14          MR. RAIFORD:  I do not believe so, Your Honor.

15          THE COURT:  Anything else from the government?

16          MS. HELART:  No, Your Honor.

17          THE COURT:  Thank you.

18          THE CLERK:  All rise.

19                  (Court adjourned at 3:40 p.m.)

20                      *    *    *

21

22

23

24

25

42

1

2                CERTIFICATE OF COURT REPORTER

3

4     I, Fred Pratt, hereby certify that the foregoing is a true

5   and correct transcript from reported proceedings in the

6   above-entitled matter.

7

8

9

10

11

12   S/FRED PRATT _____            December 29TH , 2011
     FRED PRATT, CSR
13   Official Court Reporter
     Southern District of Indiana
14   Indianapolis Division

15

16

17

18

19

20

21

22

23

24

25